UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                          :
MORTIMER OFF SHORE SERVICES,              :
LTD.,                                     :
                                          :
                Plaintiff,                :
                                          :          05 Civ. 10669 (GEL)
        -against-                         :
                                          :          **OPINION AND ORDER**
FEDERAL REPUBLIC OF GERMANY,              :
                                          :
                Defendant.                :
                                          :
------------------------------------------------------x

Peder A. Garske, Mark A. Cymrot,
Ona T. Wang, Baker & Hostetler LLP,
Washington, DC, for plaintiff.

Jeffrey Harris, Max Riederer von Paar,
Rubin, Winston, Diercks, Harris & Cooke,
LLP, Washington, DC, for defendant.


GERARD E. LYNCH, District Judge:

        Plaintiff Mortimer Off Shore Services, Ltd., brings this action to recover from defendant

Federal Republic of Germany ("Germany") the principal and interest on 351 bearer bonds ("the

Bonds") in its possession.  Germany moves to dismiss the action, arguing that the Court lacks

subject matter jurisdiction over plaintiff's claim pursuant to the Foreign Sovereign Immunities

Act, 28 U.S.C. §§ 1602-1611 ("FSIA").  Alternatively, Germany argues that, because plaintiff

has not complied with the bond validation process established by treaty and German law as a

prerequisite to suit on the Bonds, the Bonds are unenforceable, and therefore plaintiff has failed

to state a claim upon which relief can be granted.  The motion will be granted.

## BACKGROUND

**The Treaty and Validation Law**[1]

In 1953, the United States entered into a treaty with the Federal Republic of Germany, which then encompassed only West Germany, for "the orderly settlement of the obligations arising from German dollar bonds" in order to satisfy the "[e]xternal [d]ebt" West Germany incurred during World War II.[2]  To facilitate this "settlement," the Treaty incorporated by reference legislation enacted by West Germany in 1952, pursuant to which West Germany assumed liability for certain "foreign currency bonds" that had been issued by German banks prior to the end of World War II ("the Validation Law").[3]  Thus, by operation of the Validation Law, West Germany assumed liability for certain bonds issued prior to the end of World War II, and by operation of the Treaty, its liability was extended to bonds offered in the United States. See Validation Law, BGBl. I at 327, Schedule C.IV (listing the bonds offered in the United States and covered by the Validation Law).

---

[1] The Court recites here only those historical facts that are directly relevant to plaintiff's claim.  For a detailed discussion of the history of the Treaty and the events leading up to its ratification, see Abrey v. Reusch, 153 F. Supp. 337, 339-42 (S.D.N.Y. 1957).

[2] See Certain Matters Arising from the Validation of German Dollar Bonds, U.S.-F.R.G., Apr. 1, 1953, 4 U.S.T. 885, at Preamble ("Treaty" or "Treaty of 1953").  The Treaty was preceded by the London Debt Accord, in which West Germany agreed to satisfy its debt arising from World War II by assuming liability for certain obligations "due" or "entered into" prior to the end of the War.  Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443, Art. 4 ("London Debt Accord").  The London Debt Accord was also incorporated by reference into the Treaty.  4 U.S.T. 885, at Art. V.

[3] See Gesetz zur Bereinigung von deutschen Schuldverschreibungen, die auf auslandishe Wahrung lauten [Validation Law for German Foreign Currency Bonds], Aug. 25, 1952, BGBl. I at 306, Art. 1(1) (F.R.G.).

However, West Germany did not assume liability for the bonds without qualification. Instead, before the bonds can be enforced, the Validation Law requires bondholders to register their bonds with either the German Examining Agency or a Validation Board in the country of offering.  See id. at 306, Art. 3; id. at 307, Art. 8; id. at 310-11, Art. 23.[4]  If the bonds are not registered and examined by the appropriate agency, they are deemed invalid and unenforceable. See id. at 306, Art. 2, 3; id. at 317, Art. 50.  Accordingly, because the Treaty incorporated the Validation Law by reference, any bonds subject to the Treaty are "[un]enforceable unless and until [they are] validated by" the appropriate agency.[5]  Treaty of 1953, 4 U.S.T. 885, at Art. II. However, a bondholder has the right to appeal the agency's determination, either to an arbitration board, a German court, or an appropriate court in the country of offering.  Validation Law, BGBl.

_____

[4] Although the Validation Law requires the bonds to be reviewed and examined by a board of "foreign representatives," BGBl. I at 307, Art. 7, the functions of the foreign representatives were transferred to the Validation Board by a 1953 agreement between the United States and Germany ("the Agreement on Validation Procedures"), which in turn was incorporated into German law and incorporated by reference into the Treaty.  See Treaty of 1953, 4 U.S.T. 885, at Art. 2 (requiring bonds to be validated by either the Examining Agency or a Validation Board as established by the Agreement on Validation Procedures); Second Implementing Ordinance under the Validation Law for German Foreign Currency Bonds, March 7, 1953, BGBl. II at 303-04.  Cf. Abrey, 153 F. Supp. at 340-41.

[5] According to this Court's decision in Abrey, the validation requirement arose from concerns over the legitimacy of pre-war German bonds looted by Russian troops after World War II.  Prior to World War II, many of the bonds had been "repurchased and reacquired by the issuers for eventual retirement," and "no longer represented valid obligations."  Abrey, 153 F. Supp. at 339.  However, during the war, the issuers could not present the bonds to the American trustees or paying agents for cancellation.  Id.  Accordingly, large numbers of these uncancelled bonds, in negotiable form, remained in German bank vaults.  Id.  Upon Germany's surrender, Russian occupation forces seized and re-circulated the uncancelled, negotiable German bonds that had been found in German bank vaults within the area of Russia's control.  Id.  In order to avoid enforcement of the looted bonds, a validation procedure was created pursuant to which the bonds were pre-screened before enforcement to determine whether they were valid or were among the looted bonds originally seized by the Russians.  Id.

I at 312-13, Arts. 31, 33.

**Plaintiff's Claim**

In 2005, plaintiff brought suit in this Court seeking payment on 351 bearer bonds in its possession.  (Comp. ¶ 1.)  The Bonds, entitled "German Provincial & Communal Bank Consolidated Agricultural Loan Secured Sinking Fund Gold Bonds Series A," were issued on or about June 1, 1928, as part of a German national program for improving agricultural conditions in Germany, and were offered in the United States.  (Id. ¶¶ 6, 7; see BGBl. I at 327, Schedule C.IV(19) (listing the same bonds as "[o]ffer[ed] [in the] United States").)  The Bonds were issued by a consortium of fourteen banks ("obligor banks") located both within and outside of the territory constituting West Germany between the end of the war and the reunification of Germany in 1990.  (Comp. ¶¶ 7, 9.)  The obligor banks financed the Bonds by contracting for loans and distributing the proceeds to German farmers.  (Id. ¶ 7.)  Each obligor bank was severally liable for a certain portion of the value of each of the Bonds, proportionate to its share of the underlying loans.  (Id. ¶ 9.)  According to plaintiff, obligor banks located outside of the territory constituting West Germany after reunification are liable for 64.5% of the Bonds' debt.  (Lang. Decl. ¶ 4(a).)

The Bonds had a 30-year term, and were listed on the New York Stock Exchange, marketed in the Southern District of New York, and made payable in the Borough of Manhattan, New York City.  (Comp. ¶¶ 6, 8.)  The value of the Bonds (assuming their validity) is currently estimated to exceed $400,000,000 in unpaid principal and interest.  (Id. ¶ 16.)  In responding to the motion to dismiss, plaintiff makes clear that it has not submitted the Bonds for validation and that it contends it need not do so.  (Pl. Mem. 9-12.)

According to plaintiff, Germany "is liable for the outstanding and unpaid principal and interest under the Bonds." (Comp. ¶ 11.)  Germany, however, has refused to pay on the Bonds. (Id. ¶ 18.)  Thus, plaintiff demands judgment against Germany for the full amount owing on the Bonds.

**DISCUSSION**

I.      Rule 12(b)(1) Motion

Germany moves to dismiss plaintiff's claim for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), arguing that as a sovereign nation, it is immune from suit under the FSIA. Plaintiff argues that Germany's assumption of liability for bonds fits within the FSIA's exception for commercial activity, and thus that sovereign immunity is inapplicable.  Germany argues that the commercial activity exception does not apply because the Treaty, the vehicle by which West Germany assumed liability over bonds offered in the United States, was the political act of a sovereign, and therefore non-commercial in nature.  Pursuant to controlling Supreme Court precedent, Germany's assumption of liability for the Bonds constitutes commercial activity under the FSIA, and therefore the Court has subject matter jurisdiction over plaintiff's claim.

In determining the existence of subject matter jurisdiction, a court may consider evidence contained in affidavits or public documents as well as facts alleged in the pleadings.  See Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986).  The Court must draw all material factual inferences in the plaintiff's favor, see Hason v. Office of Prof'l Med. Conduct, 314 F. Supp. 2d 241, 246 (S.D.N.Y. 2004); however, "argumentative inferences favorable to the party asserting jurisdiction should not be drawn."  Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992) (citation omitted).

When a defendant moves to dismiss a complaint on the basis of foreign sovereign immunity, that defendant "must present a prima facie case that it is a foreign sovereign." See Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 241 (2d Cir. 2002) (citation and internal quotation marks omitted). Once that initial burden is met, "the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." Id. (citation and internal quotation marks omitted). Only if the plaintiff discharges this burden of production does the "ultimate burden of persuasion" pass back to the "alleged foreign sovereign" defendant. Id. (citation and internal quotation marks omitted). That burden must be met by a preponderance of the evidence. See Robinson v. Gov't of Malaysia, 269 F.3d 133, 141 n.8 (2d Cir. 2001).

The FSIA is the sole source of subject matter jurisdiction against a foreign state.[6] Cabiri v. Gov't of Republic of Ghana, 165 F.3d 193, 196 (2d Cir. 1999), citing Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989). Under the FSIA, a foreign state is "immune from the jurisdiction of the courts of the United States . . . except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1603. Accordingly, because Germany is unquestionably a sovereign foreign state, the Court lacks subject matter jurisdiction over plaintiff's suit unless plaintiff shows that a specified exception applies to its claim. Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993).

---

[6] Plaintiff asserts that the Court has jurisdiction in this case pursuant to 28 U.S.C. § 1330. (Comp. ¶ 4.) Section 1330 confers "original jurisdiction" over claims against foreign states on federal district courts. 28 U.S.C. § 1330. However, § 1330 confers original jurisdiction on the Court only to the extent that "the foreign state is not entitled to immunity under" the FSIA. Id. Thus, the Court must determine whether Germany is entitled to immunity under the FSIA in order to determine whether it has jurisdiction pursuant to § 1330.

Plaintiff relies on the FSIA's commercial activity exception to gain subject matter jurisdiction over its claim.  The commercial activity exception is the "most significant of the FSIA's exceptions."  <u>Republic of Argentina v. Weltover, Inc.</u>, 504 U.S. 607, 611 (1992).  Under the commercial activity exception, a foreign state is not immune from suit if "the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

Plaintiff argues that Germany's conduct constitutes commercial activity "outside the territory of the United States" that caused a "direct effect in the United States," thereby satisfying the FSIA's third commercial activity exception.[7]  Germany does not dispute that its assumption of liability for certain bonds offered in the United States constitutes "an act outside the Territory of the United States," or that this conduct "cause[d] a direct effect in the United States."[8]

_____

[7] Plaintiff also argues that Germany is not entitled to immunity because "the provincial banks" that originally issued the Bonds "engaged in commercial activity in the United States" by "market[ing], issu[ing], and [making the Bonds] payable in New York," thereby satisfying the FSIA's first commercial activity exception.  (Pl. Mem. 8.)  Because Germany's conduct satisfies the FSIA's third commercial activity exception, it is unnecessary to consider whether the initial issuance of bonds constitutes "commercial activity carried on in the United States" under the FSIA's first commercial activity exception.

[8] Indeed, if plaintiff is correct that Germany assumed liability for the Bonds, the impact would not merely be a "ripple[]" that "eventually reach[ed] the shores of the United States," but the obligation by Germany to satisfy an estimated $400,000,000 in principal and interest on bonds that are payable in New York.  <u>Virtual Countries, Inc.</u>, 300 F.3d at 236; <u>see id.</u> ("[A]n effect is direct if it follows as an <i>immediate</i> consequence of the defendant's activity.") (citation and internal quotation marks omitted) (emphasis and alteration in original); <u>see</u>, <u>e.g.</u>, <u>Weltover</u>, 504 U.S. at 618-19 (finding "little difficulty concluding that Argentina's unilateral rescheduling

However, Germany argues that its execution of the Treaty, the vehicle by which its liability was assumed, was a "[p]olitical act[] by a foreign state" (Def. Mem. 12), and therefore not commercial activity under the FSIA.

According to the FSIA, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1605(d). The Supreme Court clarified the commercial activity test in Weltover. In that case, plaintiffs held Argentine bonds that the government had issued as part of "emergency measures" it had adopted to refinance its debt. 504 U.S. at 609. The bonds had a repayment schedule for their principal and interest, and New York was the designated place of performance where interest payments were to be made. Id. at 619. However, when the bonds matured, Argentina attempted to unilaterally reschedule the bond payments. Id. at 610. Plaintiffs brought a breach-of-contract action to force Argentina to satisfy the bonds, relying on the FSIA's commercial activity exception as the basis for subject matter jurisdiction. Id.

The Weltover Court held that the relevant inquiry in a commercial activity determination is whether the foreign state's conduct was "the *type* of action[] by which a private party engages in 'trade and traffic or commerce.'" Id. at 614 (citations omitted) (emphasis in original). The motivation for the state's conduct is irrelevant to determining whether the conduct was commercial; thus, it was irrelevant that Argentina had issued the bonds "with the aim of fulfilling uniquely sovereign objectives." Id. The Court found that, by issuing bonds, Argentina had acted

---

of maturity dates on the [bonds] had a direct effect in the United States" because New York was the contractually-designated "place of performance") (internal quotation marks omitted).

"not as regulator of a market, but in the manner of a private player within it." Id. Accordingly, Argentina's conduct constituted commercial activity under the FSIA, and therefore Argentina was not immune from plaintiffs' suit. Id. at 617.

The facts of this case are substantially similar to those of Weltover. Both the West German and Argentine governments entered the bond market to "address a domestic [financial] crisis." Id. at 616. See Treaty of 1953, 4 U.S.T. 885, at Preamble (characterizing the goal of the Treaty as "the settlement of Germany's external [debt] obligations"). But the public, governmental purpose of the action is not determinative. Borrowing money, or guaranteeing or assuming the debt of others, is commonplace commercial activity, engaged in by non-governmental actors, not a unique power of sovereign states. Like the bonds in Weltover, the bonds in this case are "garden-variety debt instruments" that are not restricted to the "authoritative control" of a sovereign acting as a "regulator of [the] market," Weltover, 504 U.S. at 614, 615; indeed, the non-governmental nature of the bonds in this case is even clearer than that of the bonds in Weltover, as the bonds in this case were actually issued by private entities. Like the bonds in Weltover, the Bonds "may be held by private parties; they are negotiable and may be traded on the international market . . . ; and they promise a future stream of cash income." Id. at 615. In addition, like the bonds in Weltover, the bonds in this case had a payment schedule and were payable at maturity, further establishing their "garden-variety" nature. (Comp. ¶¶ 6, 8.) See Antares Aircraft, L.P. v. Fed. Republic of Nigeria, 999 F.2d 33, 34-35 (2d Cir. 1993) ("Like bonds issued by a private entity, [the bonds in Weltover] had a repayment schedule including periodic interest and principal repayment at maturity.").

Applying the holding in Weltover to this case, by assuming liability for bonds, Germany

9

was acting not as a "regulator of the market," but as a private player within it.  It is axiomatic that one party may assume liability for bonds that had been issued by another party, Nat'l Bank v. Grand Lodge, 98 U.S. 123 (1878); Germany's conduct was therefore "analogous to a private commercial transaction."  504 U.S. at 616.  Even if Germany's assumption of liability for the Bonds was motivated by "uniquely sovereign objectives" such as payment of its World War II debt, "it is irrelevant *why* [Germany] participated in the bond market in the manner of a private actor; it matters only that it did so."  Id. at 617.  Argentina's borrowing in Weltover, as much as Germany's here, was motivated by reasons of state unique to a sovereign government that differ from the commercial goals of corporate bond issuers.  Similarly, it is irrelevant that Germany's conduct "did not have the ordinary commercial consequence of raising capital or financing acquisitions."  Id. at 616.  What matters is that Germany's attempt to "refinance" debt by assuming liability for bonds is the "type" of activity that private parties "regularly" engage in. Id.; see id.  ("Engaging in a commercial act does not require the receipt of fair value, or even compliance with the common-law requirements of consideration.")

Germany makes two principal arguments to distinguish this case from Weltover.  First, Germany argues that whereas Argentina had actually issued bonds in Weltover, Germany did not issue any bonds in this case, but merely assumed liability for them.  However, this is a distinction without a difference.  Just as the issuance of bonds by a sovereign is commercial activity because private parties also may issue bonds, the assumption of liability for bonds by a sovereign is commercial activity because private parties also may assume liability for bonds.  See id. (finding Argentina's "restructur[ing]" of its bond debt to be commercial activity because private parties also may restructure their bond debt).  Any private party could have done the same thing that

Germany did here; there was "nothing distinctive about [Germany's] assumption of debt (other than perhaps its purpose) that would cause it" to be classified as non-commercial activity.  Id. at 615.

Alternatively, Germany argues that, because it assumed its liability pursuant to an international treaty, its conduct was "political" and therefore does not constitute commercial activity.  Specifically, Germany argues that "government to government agreement[s] . . . do not fall under [the FSIA's] commercial activity [exception]," even where such agreements "affect[] the commercial activities of its citizens."  (Def. Reply 2.)  In support of its argument, defendant cites Wolf v. Fed. Republic of Germany, 95 F.3d 536 (7th Cir. 1996), in which Germany's international agreement to pay war reparations to Holocaust survivors was deemed non-commercial activity, and Cicippio v. Islamic Republic of Iran, 30 F.3d 164 (D.C. Cir. 1994), in which the kidnapping of American citizens by Iranian agents to force the unfreezing of Iran's assets was deemed non-commercial activity.  Germany's interpretation of the commercial activity exception misunderstands the relevant case law and would undermine the Supreme Court's holding in Weltover.

It is irrelevant that Germany's commercial obligation here arose pursuant to a treaty rather than the signing of a contract; the relevant inquiry is the nature of Germany's conduct, not the vehicle by which the conduct occurred or the fact that the conduct was the result of an intergovernmental negotiation or agreement.  Thus, Wolf and Cicippio are wholly inapposite to this case.  The determinative factor in Wolf was not that Germany's obligation arose pursuant to an international agreement.  Rather, Germany's conduct was deemed non-commercial because only sovereigns may engage in war, and therefore war reparations by their nature are not "the

kind of ordinary commercial transaction that a private party might undertake."  95 F.3d at 543;

see Hirsh v. State of Israel, 962 F. Supp. 377, 382 (S.D.N.Y. 1997) (finding that the "payment of

reparations to Holocaust survivors" is "quintessentially governmental behavior").  Similarly, the

determinative factor in Cicippio was not that plaintiffs were kidnapped in order to force

intergovernmental negotiations; instead, the kidnapping was deemed non-commercial because

"[t]he United States government was acting purely as a sovereign regulator when it froze the

assets of Iran and its citizens, and the government of Iran's alleged efforts to release the freeze

were likewise peculiarly sovereign."  30 F.3d at 168.  Thus, neither Iran nor Germany were

acting as private parties within the commercial market: only a sovereign, and not a private party,

can pay war reparations, and only a sovereign, and not a private party, can act to release its frozen

assets.

      Moreover, Germany's reading of the commercial activity exception would undermine the

holding of Weltover.  Although private parties cannot enter into treaties, private parties also

cannot enact laws, or privatize industries, or do many of the other things that sovereigns must do

*qua* sovereigns in order to engage in commercial activity such as borrowing money.  If the fact

that Germany assumed this liability by treaty rendered its activity in the bond market non-

commercial, then much market activity carried on by a foreign state would not constitute

commercial activity, as sovereigns often act by means that are unavailable to private parties.

This is plainly not the intended consequence of Weltover; instead, Weltover demands that the

Court look behind the sovereign character of the means to determine whether the *nature* of the

activity is of the "type" that private parties also engage in during the course of "trade and traffic

or commerce."  See WMW Machinery, Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau,

12

960 F. Supp. 734, 740 (S.D.N.Y. 1997) ("[The commercial activity] determination requires the

Court to look beyond generalized characterizations to the particular conduct that would entitle

plaintiffs to relief under their theory of the case."); see, e.g., Drexel Burnham Lambert Group Inc.

v. Comm. of Receivers for Galadari, 12 F.3d 317, 320 (2d Cir. 1993) (finding the United Arab

Emirates' "first attempt to frame an insolvency law" to constitute commercial activity);

Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 750 (S.D.N.Y. 2004) (finding

government's privatization of oil industry to constitute commercial activity).  Cf. Em Ltd. v.

Republic of Argentina, 473 F.3d 463, 483 n.21 (2d Cir. 2007) (stating that a government's

"regulatory actions in connection with the receipt of [a] loan" may constitute commercial

activity).  Thus, whether a government acts pursuant to the enactment of a law or regulation,

privatization of an industry, ratification of a treaty, or some other measure that is only available

to sovereigns, such a consideration is irrelevant to the determination of whether the activity was

commercial.[9]

---

[9] The Second Circuit's recent decision in Em Ltd. does not conflict with the Court's
holding in this case.  In Em Ltd., plaintiffs attempted to attach funds held by the Argentinian
national bank to satisfy a debt arising from Argentina's nonpayment on certain bonds.  473 F.3d
at 465.  Under the FSIA, the property of a foreign state is not immune from attachment if "the
property is or was used for . . . commercial activity."  28 U.S.C. § 1610(a).  Thus, plaintiffs
argued that their attachment claims were not subject to the FSIA because the bank had used the
attached funds to repay Argentina's debt to the International Monetary Fund ("IMF"), which
plaintiffs asserted constituted commercial activity under the FSIA.
     The Circuit applied Weltover to determine whether Argentina's debt payment to the IMF
constituted commercial activity.  473 F.3d at 481-84.  The court concluded that Argentina's
issuance of bonds in Weltover was not analogous to its repayment of debt to the IMF.  Because
the IMF is a "unique cooperative international institution" that has no counterpart in the
commercial marketplace, Argentina's "relationship with the IMF is not commercial in nature."
Id. at 482.  "[W]hen [Argentina] borrows from the IMF, it exercises power[s] peculiar to
sovereigns," id. (citation and internal quotation marks omitted), and such activity therefore "takes
place outside the commercial marketplace."  Id. at 484.
     Although the Circuit recognized that the IMF was established by, and Argentina's

Although it may be difficult in some cases to separate the "purpose" of a state's conduct from its "nature," Weltover, 504 U.S. at 617, the Court has no such problem here.  The Supreme Court has already drawn an almost identical line in Weltover, and all the Court has to do here is apply that line.  Thus, because the FSIA's commercial activity exception applies to plaintiff's claim, Germany is not entitled to sovereign immunity here.  Accordingly, the Court has subject matter jurisdiction over plaintiff's claim.

II.     Rule 12(b)(6) Motion

        A.      Motion to Dismiss Standard

        Germany also moves to dismiss plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that it does not state a claim upon which relief may be granted.  A complaint may be dismissed pursuant to Rule 12(b)(6) where the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1974 (2007).  As the Second Circuit has recently stated, Twombly requires that a plaintiff satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels

---

responsibilities to the IMF are governed by, treaty, the existence of the treaty was merely support for the Circuit's finding that "[t]he IMF is a unique cooperative international institution" of which *only nations*, and not private parties, could be members.  Id. at 482.  Thus, the existence of a treaty evidenced that private parties were excluded from interacting with the IMF on any level, from membership to financial services, because the IMF was purely a "diplomatic" creation that had no analogous counterpart in private commerce.  Id. at 484.  That is plainly not the case with the bond market or the bonds at issue here; bonds, unlike IMF loans, are "garden-variety debt instruments" that are "available in the commercial market," id. at 483-84, and anyone – government and private party alike – may enter the bond market.

and conclusions, and a formulaic recitation of the elements of a cause of actions will not do."

Twombly, 127 S. Ct. at 1964-65 (internal quotation marks omitted).  In order to state a claim, the

factual allegations contained in the complaint "must be enough to raise a right to relief above the

speculative level."  Id. at 1965.

When deciding a 12(b)(6) motion, the Court must take as true the facts as alleged in

plaintiff's complaint.  Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006); Bolt Elec.,

Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995).  It may consider documents

incorporated in the complaint by reference.  Chambers v. Time Warner, Inc., 282 F.3d 147, 152-

53 (2d Cir. 2002).  All reasonable inferences must be drawn in the plaintiff's favor.  Freedom

Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004).  However, "[g]eneral, conclusory

allegations need not be credited . . . when they are belied by more specific allegations of the

complaint."  Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995); Whyte v.

Contemporary Guidance Servs., Inc., No. 03 Civ. 5544, 2004 WL 1497560, at *3 (S.D.N.Y. July

2, 2004).

B.    Application of the Treaty and Validation Law

Germany argues that, because plaintiff has failed to comply with the bond validation

procedures established by the Validation Law, plaintiff's bonds are unenforceable and therefore

plaintiff cannot receive relief from this Court.  Conversely, plaintiff argues that a portion of the

Bonds are not subject to the Validation Law; thus, plaintiff argues that the Court may enforce

that portion of the Bonds, notwithstanding plaintiff's failure to comply with the bond validation

procedures.[10]   However, because the Validation Law is the only apparent source of Germany's

liability on the Bonds, defendant's motion will be granted.

According to the Treaty, "[n]o bond" listed in the Validation Law "[is] enforceable unless

and until it shall be validated" either by the Examining Agency in Germany or by the Validation

Board in the country of offering.  8 U.S.T. 885, at Art. II.  In order to be validated, the bonds

must be registered within one year (or two years if failure to register was not due to the

registrant's gross negligence) from the Opening Date, which is defined in the Validation Law as

six months from August 25, 1953.  See BGBl. I at 310, Art. 19, 21.  Once the bonds are

registered, the Validation Law requires an administrative hearing at which the registrant must

establish that the bond was held outside of Germany on January 1, 1945, that the registrant was

the "lawful acquirer" of the bond, or that the bond has been "restituted" to the registrant after

being confiscated prior to May 8, 1945.  Id. at 306, Art. 3.  The registrant has the burden of

proving that the bonds are entitled to be validated.  Id. at 315, Art. 41.

Germany argues that plaintiff was required to comply with the terms of the Treaty and the

Validation Law before the Bonds may be enforced in this Court.  Thus, since plaintiff did not

register its bonds or prove the Bonds' validity at an administrative hearing, Germany argues that

this Court cannot enforce the Bonds.  See, e.g., Teplin v. Fed. Republic of Germany, No. 81-

1874, 1982 U.S. App. LEXIS 12629, at *1 (D.C. Cir. Aug. 18, 1982) (affirming summary

judgment for Germany because "the contested bonds . . . had not been validated in accordance

---

[10] None of the Bonds were financed entirely by one obligor bank; instead, each bond was
financed by the consortium of obligor banks.  Thus, according to plaintiff, each obligor bank was
only responsible for a portion of the Bonds proportionate to its share of the Bonds' underlying
debt as financed by the consortium.  (Lang Decl. ¶ 4.)

with [the] legal requirements");[11] <u>Cavac Compania Anonima Venezolana de Administracion y</u> <u>Comercio v. Bd. for the Validation of German Bonds in the U.S.</u>, 189 F. Supp. 205 (S.D.N.Y. 1960) (considering the enforceability of bonds only *after* the Validation Board denied validation); <u>Abrey</u>, 153 F. Supp. 337 (same).  Plaintiff does not dispute that, pursuant to the Validation Law, Germany assumed liability for the portion of plaintiff's bonds backed by the West German obligor banks.  (<u>Compare</u> Comp. ¶ 9, <u>with</u> BGBl. I at 327, Schedule C.IV(19).) Thus, plaintiff concedes that, because it has not complied with the terms of the Treaty and Validation Law, it cannot receive relief from this Court on that portion of the Bonds issued by obligor banks in West Germany.

Nevertheless, plaintiff argues that relief may be granted on that portion of its bonds backed by obligor banks located in territory that was, at the time of the enactment of the Treaty and the Validation Law, part of East Germany.  Specifically, plaintiff argues that the Validation Law does not apply to the portion of the value of its bonds that was backed by obligor banks outside West Germany because the portion of its bonds financed by obligor banks that were not located in West Germany was specifically excluded from the reach of the Validation Law. Moreover, plaintiff argues that events that occurred after the execution of the Treaty, such as the Treaty of 1960 which extended the Validation Law to certain bonds (not included those at issue in this case) issued by East German banks,[12] and the Unification Treaty of 1990 which

---

[11] <u>Teplin</u> is an unpublished *per curiam* opinion.  1982 U.S. App. LEXIS 12629. However, the considered judgment of a panel of respected appellate court judges is at least as instructive as such freely-citable materials as student-authored law review notes, especially in a case such as this one in which there is scant precedential authority.

[12] <u>See</u> Zweites Abkommen zwischen der Bunderepublik Deutschland und den Vereinigten Staaten von Amerika uber gewisse Angelegenheiten, die sich aus der Bereinigung deutscher

specifically excluded the Validation Law from incorporation into German law upon reunification,[13] establish that the Treaty and Validation Law do not apply to the portion of its bonds that was financed by East German obligor banks.  Therefore, plaintiff argues that the Court must deny defendant's motion to dismiss and allow the parties to proceed with discovery so that plaintiff may conclusively determine the portion of its bonds that are not subject to the Validation Law.

However, to survive this motion to dismiss, plaintiff cannot simply seek to disprove Germany's defense; instead, plaintiff must affirmatively plead the source of Germany's obligation to satisfy the Bonds, because only if such a source exists has plaintiff stated a claim upon which the Court can potentially grant relief.  To state a claim upon which the Court can potentially grant relief, plaintiff need only provide "a short and plain statement of the claim showing that the plaintiff is entitled to relief."  Fed. R. Civ. P. 8(a).  This standard is designed to provide "fair notice" to defendants of "the nature of the case," allowing defendants "to answer and prepare for trial."  Wynder v. McMahon, 360 F.3d 73, 79 (2d Cir. 2004); see id. ("The key to Rule 8(a)'s requirements is whether adequate notice is given.").  Although the pleading standard is "lenient," Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988), dismissal is required where the complaint does not include a claim upon which the Court could grant relief.

---

Dollarbonds ergeben [Second Agreement between the Federal Republic of Germany and the United States of America Regarding Certain Matters Arising from the Validation of German Dollar Bonds], March 3, 1961, BGBl. II at 464-69 [hereinafter Treaty of 1960].

[13] See Vertrag zwischen der Bundesrepublik Deutschland und der Deutchen Demokratischen Republik uber die Herstellung der Einheit Deutschlands (Einigungsvertrag) [The Treaty between the Federal Republic of Germany and the German Democratic Republic on the Establishment of Germany Unity (Unification Treaty)], Aug. 31, 1990, BGBl. II at 889, translated in 30 I.L.M. 457 [hereinafter Reunification Treaty].

The complaint alleges that "Germany is liable for the outstanding and unpaid principal and interest under the Bonds." (Comp. ¶ 12.)  The complaint is vague about the source of this liability; plaintiff alleges that Germany generally "guaranteed, succeeded to, and/or assumed" liability for the Bonds, and contends that because Prussia had "guaranteed" some of the obligor banks when the Bonds were issued, the Court may assign the same liability to Germany.  (Id. ¶¶ 10, 11.)  During oral argument, plaintiff elaborated on this theory, arguing that Germany's successor liability is located in "various sources; statements and representations by the government reflected in various treaties, reflected in some of the early post[-]war activities." (Tr. 40.)  Thus, plaintiff argues that Germany's assumption of debt is rooted, "[n]ot solely" in a juridical document such as a treaty, but in "multiple sources" that reflect, "from an evidentiary point of view," Germany's assumption of liability for the Bonds.  (Id.)

In an ordinary commercial dispute between private parties, the conclusory allegations that an entity "guaranteed, succeeded to, and/or assumed" liability for bonds might well be sufficient to satisfy the Rule 8(a) standard.  As it is axiomatic that a private party may legally assume debt through a variety of measures, ranging from a written contract to an oral agreement, Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1538 (2d Cir. 1997), the precise means by which the defendant assumed liability would be a mere matter of evidentiary detail, that would not need to be pleaded.  Moreover, the common law doctrine of successor liability allows, under certain circumstances, the assignment of liability for the pre-existing debt of a predecessor entity to its successor, even in the absence of an explicit agreement to pay such debt between the successor and creditor.  See Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41 (2d Cir. 2003).

However, unlike private parties, sovereigns can *only* assume liability for debt of

19

predecessor states through explicit acts that leave traces in legal documents.  Yucyco, Ltd. v. Republic of Slovenia, 984 F. Supp. 209, 218 (S.D.N.Y. 1997) (dismissing claim because plaintiff had failed to allege that the sovereign had "explicitly assumed" its predecessor's role as debt guarantor).  In addition, such acts must be voluntarily and affirmatively undertaken by the successor state; the common law doctrine of successor liability is inapplicable to successor sovereigns because sovereigns may only voluntarily assume debt through *affirmative acts* such as enacting a law or entering into an international agreement: "There is no rule of law that automatically subrogates successor states to their predecessor's debt."  767 Third Ave. Assocs. v. Consulate General of Socialist Fed. of Yugoslavia, 218 F.3d 152, 161 (2d Cir. 2000); see, e.g., Paul Williams & Jennifer Harris, State Succession to Debts and Assets: The Modern Law and Policy, 42 Harv. Int'l L.J. 355 (2001) (discussing the various measures by which former republics of the Soviet Union, Yugoslavia, and Czechoslovakia assumed the debt of their predecessor states, all of which involved affirmative acts by the republics) [hereinafter Williams & Harris, State Succession].  Speeches, even by heads of state, will not suffice to assign liability for debt to a sovereign, nor can the Court assign liability to a sovereign without locating such liability in a voluntary, affirmative, and explicit act by the sovereign.  See Yucyco, 984 F. Supp. at 218 ("As a successor state, Slovenia is not legally bound by any contract executed by the former Yugoslavia unless Slovenia has voluntarily 'assumed' the responsibilities of the predecessor state and 'the other party or parties thereto agree or acquiesce.'"), citing Restatement (Third) of Foreign Relations Law § 210(3).

Moreover, such an assignment by the Court, without a voluntary, affirmative, and explicit

20

act by Germany, would be a usurpation of the executive power and would require resolution of an eminently political question best left to the Executive Branch and the international community, i.e., how to structure and allocate the debt of a successor state.  See 767 Third Ave. Assocs., 218 F.3d at 160 ("A determination by this court of the allocation of debt among the successor [states to the former Socialist Federal Republic of Yugoslavia] might hinder or prejudice the future resolution of this issue through negotiations or another determination by the Executive [Branch of the U.S. Government].  Such an outcome would directly 'interfere with executive foreign policy prerogatives.'"), quoting Can v. United States, 14 F.3d 160, 163 (2d Cir. 1994); Yucyco, 984 F. Supp. at 219 (characterizing "the settlement of foreign debts" as "fall[ing] squarely within the ambit of the President's and Congress's constitutional authority").  Thus, only if a successor state assumed liability for its predecessor's debt pursuant to a "controlling agreement, treaty, or similar instrument" may the Court assign liability to the successor for such debt; without such a "legal instrument," the Court would be required to make "policy determinations, . . . for which the Court is ill-suited."  Yucyco, 984 F. Supp. at 219, citing Baker v. Carr, 369 U.S. 186, 217 (1962).

Accordingly, the relevant inquiry here is whether Germany assumed liability for the Bonds through a voluntary, affirmative, and explicit act that may be "interpret[ed] and enforc[ed]" by the Court.  See 767 Third Ave. Assocs., 218 F.3d at 162 n.7 ("Certainly, *once the successors resolve these issues by treaty or another type of agreement*, courts may interpret and enforce rights created by such an agreement.") (emphasis added).  Such an act would provide the Court with "satisfactory criteria" by which it may evaluate Germany's liability for the Bonds. Yucyco, 984 F. Supp. at 219 (internal quotation marks omitted).

Although the complaint does not specifically plead such a voluntary, affirmative, and explicit act, nevertheless, in an abundance of caution, the Court has searchingly examined the complaint to determine whether such an act could be ascertained.  The only such act vaguely alluded to in the complaint is the London Debt Accord.  (See Comp. ¶ 11 ("After World War II, Germany entered into an agreement with the Allied High Commission in which it assumed liability for the pre-war external debt of the German Reich.")  Pursuant to the London Debt Accord, West Germany agreed to satisfy its debt arising from World War II by settling certain obligations "due" or "entered into" before the end of the War.  4 U.S.T. 443, Art. 4.  However, West Germany agreed to satisfy its debt pursuant to the London Debt Accord only to the extent that "the pecuniary obligations" *of West Germany* existed prior to the end of the War.  4 U.S.T. 443, Art. 4; see id. Art. 25 (stating that the Accord *may* be extended to East German debts upon reunification).  Indeed, plaintiff conceded at oral argument that the London Debt Accord did not apply to East German debts.[14]  (Tr. 31.)  Thus, *West* Germany did not assume the debt of banks in East Germany under the London Debt Accord; indeed, it would have been illogical for West Germany to assume such debt, as West and East Germany were separate political entities at the time of the Accord.

The only other voluntary, affirmative, and explicit acts taken by Germany relevant to the

---

[14] Even if the London Debt Accord was extended to East German debts after unification, the Accord incorporates by reference the Validation Law.  4 U.S.T. 443, Annex IV, Art. 25 ("This settlement shall not apply to bonds . . . which require to be validated under the German Validation Law . . . until these bonds . . . have been validated pursuant to the provisions of such law[] . . . .").  Therefore, any East German bonds subject to the Accord would also be subject to the Law, and plaintiff still would be required to comply with the validation procedures.

bonds at issue in this case are the Validation Law and the Treaty.  Even assuming *arguendo* that, contrary to plaintiff's argument, Germany assumed liability for debts of East German obligor banks pursuant to the Validation Law and Treaty, plaintiff's claim fails.  If West Germany did assume liability for the portion of bonds financed by East German obligor banks under the Validation Law and Treaty, then plaintiff's failure to comply with the terms of the Validation Law dooms its claim because bonds subject to the Validation Law are only enforceable under the Treaty upon registration and examination, which plaintiff has failed to do.

Thus, there is no need for more discovery in this case, and there is no need for the Court to determine the impact of the Treaty of 1960 and the Unification Treaty of 1990 on the Validation Law.  If plaintiff is correct that the Validation Law did not extend to the portion of the Bonds financed by East German obligor banks, then Germany has assumed no liability for that portion of the Bonds and plaintiff has no claim upon which relief may be granted.  Conversely, if the Validation Law does extend to the portion of the Bonds financed by East German obligor banks, then plaintiff has failed to comply with the terms of the Validation Law and also has no claim upon which relief may be granted.

Put simply, plaintiff has not complied with the legal requirements of the Treaty and Validation Law; thus, plaintiff cannot receive relief on its claim with regards to the 35.5% of its bonds that plaintiff does not dispute is subject to the Treaty and Validation Law.  If plaintiff is correct that 64.5% of the value of its bonds is not subject to the Treaty and Validation Law, then plaintiff cannot receive relief from the Court with respect to that portion of the Bonds, as Germany has only assumed liability for those bonds that are subject to the Validation Law and plaintiff has not pled another source of liability, nor has another source been located by the

Court.[15]  There is no middle ground here; Germany only assumed liability over the Bonds as far

as the terms of the Treaty and Validation Law, and no further.[16]

This holding neither forecloses plaintiff from seeking payment from Germany for any

portion of the Bonds, nor forecloses this Court from reviewing the decision of the Validation

Board.  Instead, if the Bonds are deemed invalid by the Validation Board, plaintiff can appeal the

Board's decision to an arbitration board, a German court, or this Court.  See Validation Law,

BGBl. I at 312-13, Arts. 31, 33, 35.  See, e.g., Abrey, 153 F. Supp. at 347-48 (finding that the

court's review of the validation decision should be plenary).  Cf. Validation Law, BGBl. I at 313,

Art. 33(3) (waiving sovereign immunity for appeals from the validation decision).  The Court

holds only that plaintiff has not stated a claim upon which relief may be granted *at this time*

because plaintiff has not yet complied with the administrative process created by the Validation

Law.  See, e.g., Reiter v. Cooper, 507 U.S. 258, 269 (1992) ("Where relief is available from an

administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before

proceeding to the courts; and until that recourse is exhausted, suit is premature and *must be*

---

[15] If plaintiff is correct that the Validation Law does not apply to the portion of its bonds financed by East German banks, it is unclear whether plaintiff could seek relief from another party, such as the original issuing bank.  The Court makes no determination as to whether plaintiff may seek such relief; the Court only finds that whatever relief that is available to plaintiff against Germany itself is contingent upon plaintiff's compliance with the Treaty and Validation Law.

[16] Indeed, the existence of another source of liability would contravene the goal of the Validation Law, which was enacted to protect West Germany from being forced to pay on "looted bonds" seized by Russian forces.  Abrey, 153 F. Supp. at 339.  Plaintiff has suggested no plausible reason why West Germany would assume liability for the pre-war debt of East German banks, but would not subject those bonds to the same restrictions of the Treaty and Validation Law that apply to bonds issued by West German banks.  The protection established by the Treaty and Validation Law exists concurrently with, and not independent of, West Germany's assumption of liability for its pre-war debt.

of redress before proceeding to the courts; and until that recourse is exhausted, suit is premature and *must be dismissed*.") (emphasis supplied).

Accordingly, defendant's motion to dismiss is granted.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is granted.


SO ORDERED.

Dated: New York, New York
September 27, 2007

GERARD E. LYNCH
United States District Judge

25